No. 2347.

## Steve Blakely v. The State.

1. ACCESSARY—INDICTMENT.—See the opinion for an indictment held sufficient to charge the accused as an accessary to murder, as accessary is defined by article 86 of the Penal Code.

2. SAME—DEFINITION.—"An accessary is one who knowing that an offense has been committed conceals the offender or gives him any other aid in order that he may evade an arrest or trial or the execution of his sentence. But no person who aids an offender in making or preparing his defense at law, or procures him to be bailed though he afterwards escape, shall be considered an accessary." It is not essential under this definition that the aid rendered to the criminal shall be of a character to enable the criminal to effect his personal escape or concealment, but it is sufficient if it enables him to elude present arrest and prosecution. The facts upon which the indictment in this case was based were that immediately after the commission of the homicide by the principal he and the defendant had a retired private consultation, after which the principal mounted a horse and disappeared, and the defendant charged the only two other witnesses present to testify on the inquest to a statement fabricated by himself, to the end that, upon final trial, the principal might be acquitted or released on nominal bond. *Held*, that such facts would constitute the defendant an accessary within the purview of the statute.

3. SAME.—That the facts above stated, if proved, would constitute the offense of subornation of perjury, would not defeat the prosecution of the accused as an accessary to murder.

4. SAME—ACCOMPLICE TESTIMONY.—Under the rules of practice obtaining in this State, a conviction can not be had upon the testimony of an accomplice unless it be strongly corroborated by other evidence; and an accomplice can neither corroborate himself nor another accomplice. Another rule is that if a witness implicates himself in the offense it is immaterial that he claims to have been coerced—no matter what his motive, if he agrees to and does participate in the offense, he is an accomplice or particeps criminis.

5. SAME—CASE STATED—FACT CASE.—The issue in this case was whether the defendant fabricated the narrative of the homicide committed by his principal, which was related upon the inquest over the deceased by the witnesses who testified against him on this trial. That issue was supported only by the uncorroborated testimony of the two witnesses who claimed that they testified to the fabricated statement upon the inquest because commanded to do so by the defendant, and because they were in fear of the defendant and his principal. *Held* that, in the absence of corroborating testimony, the evidence is insufficient to support this conviction.

APPEAL from the District Court of Falls. Tried below before the Hon. Eugene Williams.

The indictment in this case charged the appellant as an accessary to the murder of D. Daffin, by Erasmus May in Falls county, Texas, on the third day of July, 1884. The trial of the appellant resulted in his conviction, and his punishment was assessed at a term of five years in the penitentiary.

It was fully proved, and not controverted, that the deceased, D. Daffin, was shot and almost instantly killed by Erasmus May. at a hay camp, in Falls county, on the day alleged in the indictment. Deceased's father testified that deceased, at the time he was killed, was about twenty-one years old, well grown and stout, and weighed about one hundred and seventy-five pounds. Witness reached the hay camp an hour or two after the killing, and found the body of deceased lying on his back, near the cook house, and about thirty feet from the tent. Deceased's right hand lay across his breast, with a knife lying loosely in it. It was a pocket knife, with a blade open and about three inches long. Witness saw no blood on the knife. The body was not moved while witness remained. Of his own knowledge the witness could not say who killed his son. There was but one wound

on the body.   It was a gun shot wound, and the ball entered be-low the left nipple and passed directly through the body.

Doctor Whatley, for the State, testified that he was a brother-in-law of the deceased, and reached the latter's body after life was extinct.   He noticed a knife in the deceased's hand, which was lying across his body.   There was no blood on the knife. Witness believed that the deceased, if he had the knife in his hand at the time he was shot, would have dropped it instantly. Shot as he was, any man would have instantly dropped anything in his hands.

N. Stallworth, for the State, testified that he was a justice of the peace of Falls county, in 1884, and he was notified of the killing of the deceased on the morning it occurred.   He sum-moned a jury of inquest and went to the scene of the homicide, reaching there about ten or eleven o'clock in the forenoon.   A number of people were there, and among them were defendant and Frisby Henderson and Alf. Nelson, but May was not there. The body of the deceased lay upon the back, with one hand by his side and the other across his breast, with a knife, not grasped, but lying in it loosely between his fingers and body.   The point of the knife was down, and was caught in a fold of deceased's shirt.   Witness could not say whether the body had been moved; there were no marks indicating that it had, and he saw no blood except where it lay.   There was but one wound on it, and that was where a ball had entered below the left nipple and passed straight through the body.   Defendant, Frisby Henderson and Alf. Nelson testified at the inquest.   The proceedings at the in-quest were handed to the district clerk by witness, and he had not seen them since, nor could he say where they were.   There was no blood on the knife.   The body lay about twenty feet from the tent, with the feet pointed diagonally towards the mouth of the tent.   The wire cutter was thirty or forty feet from the tent, and the wagon about the same distance.   A mesquite tree stood about five feet from the southeast corner of the tent, which was about eight or ten feet long by five or six in width.   Frisby Hen-derson, Alf. Nelson and defendant testified before the jury of in-quest, and their statements were substantially the same, and favorable to May.   In effect, their testimony was that, on the morning of the killing, the deceased (who was the foreman of the party) came to the hay camp and told Alf. Nelson to go and catch the mules, which were grazing some distance away.   Nel-son started off, and deceased ordered May to help Nelson catch

the mules. May tried to find a rope, but could find none, and so told the deceased, who immediately said to May: "You G—d d—d son of a bitch, I'll make you make a rope," and ran to the wagon and assaulted May with a knife, cutting May's shirt in two places before May could get out of his reach. May then ran around the tent, the deceased pursuing and cutting at him with his knife, and, as May ran by the tent, he snatched a pistol from the tent, and while in a stooping position pointed the pistol around his left arm, without rising to an erect position, and fired back as he ran, the ball taking effect in the body of the deceased. The deceased then stopped, stepped back a few steps and sat down, lay back and died in about ten minutes. Defendant, after saddling a horse, left camp to go for Mr. Mark Harwell, for whom the deceased and the others were cutting hay. The jury of inquest returned a verdict of justifiable homicide, and no warrant was then issued for the arrest of May. A few days after the inquest May voluntarily surrendered, and witness put him under a nominal bond to await the action of the grand jury. May complied with the bond, but the next grand jury found no indictment against him. He had not left the county, so far as witness knew, but was out of the way when the inquest was held.

Frisby Henderson testified that he was cooking breakfast; May and Alf Nelson were sitting down by the tent, when the deceased rode up and said, "Frisby, is breakfast done?" Witness told him it was. He said witness never had enough bread, and to cook more. He spoke to Nelson and said, "Alf, go and get up the mules; old Blue will be gone to hell in a minute." He then told May to go and help Alf get the mules. Alf went on, and May still sat there, and said he had no rope. Deceased rode to a tree and tied his horse, and then went to the wire cutter, some twenty steps southeast of the tent, and commenced cutting wire. Directly he again told May to go and help Alf get the mules. May replied that he had no rope, and that, by God, he didn't have to make one. Deceased then turned from the wire cutter, and, walking toward May, said: "You God d—d son of a bitch, I'll make you make a rope." Deceased had nothing in his hand; witness was standing where he could see. When deceased got in about ten steps of May, the latter reached down under the northeast corner of the tent and got Mr. Harwell's six shooter pistol, which was kept at the camp, and he leveled it at the deceased. Deceased stopped, and he and May looked at each other some time, neither of them speaking, when May fired, and de-

ceased turned and walked back and a little past where witness was standing, and then lay down on his back. May, with his pistol, followed the deceased, and said: "Oh, yes, God d—n you, I've got you." He walked up to deceased with the pistol in in his hand, and the deceased said: "Don't shoot me any more." May did not try to shoot any more, but stood there until the deceased died, and then put his hand into deceased's pocket, took out deceased's knife, opened it, and cut his own shirt in two places, crosswise. Deceased had one of his legs drawn up, and was left in that position by the defendant. After May cut his own shirt, which was a very close fitting white knit undershirt, he and Steve Blakely, this defendant, stepped aside and had a talk, which the witness could not hear. Then May saddled the pony which was worked to the hay rake and rode off toward Gassoway's pasture. After he had gone, defendant came to witness and Alf Nelson and told them what statement they must make about the killing. The witness then proceeded to give the statement which defendant said must be given. In substance it was the same as the version given by the previous witness, Stallworth, of the testimony of defendant, Henderson and Nelson at the inquest held over the body of the deceased. Defendant told the witness and Nelson that nobody would know any better, and that, if they would swear to that statement before the inquest, the jury would clear May or would release him on nominal bail. Witness agreed to make the statement, and he swore to it before the jury of inquest, and once before the grand jury. He was afraid not to swear to it; he was afraid of the defendant and May. He was afraid May would kill him like he had killed the deceased if he did not swear it. When May killed the deceased, Alf Nelson was off after the mules, but he came up pretty soon, and, while some distance off, he asked what was the matter Witness told him that Erasmus May had shot Mr. Daffin. Nel son commenced hallooing and started to run off, but defendan called him and he then came up. Soon after the shooting, de fendant got on the deceased's horse and went after Mr. Harwell What the witness has sworn to at this trial is the truth, and hi reason for previously swearing differently was because he was afraid of violence from the parties concerned. Witness had never talked to May about this matter.

Hugh Barnett, for the State, testified that he was a member of the coroner's jury which investigated the cause of the deceased's death. The jury of inquest did not make a close examination of

the ground nor make any measurements. They exonerated May on the testimony of the three negroes, Henderson, Nelson and Blakely, which has already been stated in Stallworth's testimony.

. Alf. Nelson, for the State, testified that he went for the mules when told by the deceased to do so, and he got them across a ridge and out of sight of the hay camp, when he heard a pistol fire and went up on the hill to see what was the matter. Just as he got in sight, Frisby Henderson hallooed to him, saying that May had shot the deceased. This frightened the witness, and he commenced to halloo, and ran towards home, when defendant hallooed to him, and he stopped, and then turned around and went towards the camp. Daffin was dead when witness got back to camp. Witness saw no one go up to the deceased, and did not see May get the deceased's knife out of his pocket. When witness, after he started back, first saw May, the latter was saddling the rake horse, which he afterwards rode off. Witness heard only one shot. Witness did not go nearer than fifteen or twenty feet of the body, and May had then ridden away. Defendant Blakely took the witness and Frisby Henderson off to one side, and told them what they had to swear. At first the witness declined to swear to it, and defendant threatened him if he did not, and said that nobody would ever know the difference. He said that, if witness did not swear what he told him, he, the witness, would be apt to come up with the "bell off." Witness was scared, and agreed to swear it. Witness gave the substance of what he was required to swear, as the same in detail has already been set out in Stallworth's testimony, and as he did testify before the coroner's jury. May was not under arrest at that time. Witness was now telling truthfully all he knew about the killing. Of his own personal knowledge, he could not say who fired the fatal shot, and all he knew about the shooting was what he was told by defendant and Henderson..

Nelson Denson, for the State, testified that he saw Erasmus May on the streets of Marlin, a few days after the killing, and heard him talking about it. He was wearing a white knit undershirt, which he said he had on the day he killed Mr. Daffin. He then showed to witness the places where his shirt was cut. Witness noticed them closely. One was in the side, and the other across the back, and both ran crossways of the body. The shirt fit May very closely, and witness looked for cuts in his skin, but could not see where the skin was even grazed. In the witness's

opinion, the shirt could not have been cut while on May, as he represented, without cutting the skin, as it fit so close.

The State next introduced in evidence the indictment against Erasmus May for the murder of D. Daffin, and the case was closed.

*Alexander, Winter & Dickenson,* for the appellant.

*W. L. Davidson,* Assistant Attorney General, for the State.

White, Presiding Judge. This is a companion case to Erasmus May v. The State, 23 Texas Court of Appeals, 146.

In the first count the indictment charges May with the murder of Derush Daffin, and in the second count the charge as set forth against this appellant is that "after the commission of the aforesaid offense of murder by the said Erasmus May, as aforesaid, and well knowing the said Erasmus May to have committed said offense, Steve Blakely (the defendant) did then and there unlawfully, willfully and feloniously, conceal and give aid to the said Erasmus May, in order that he, the said Erasmus May, might evade an arrest and trial for said offense; and so the grand jurors aforesaid, upon their oaths aforesaid, do say that he, the said Steve Blakely, did then and there become and make himself an accessary to the murder and killing of the said Derush Daffin by the said Erasmus May, in the manner and form as aforesaid, contrary," etc. The indictment sufficiently charged the offense (Willson's Crim. Forms, No. 539, p. 232) under article 86 of the Penal Code, which defines the crime in the following language, viz: "An accessary is one who, knowing that an offense has been committed, conceals the offender or gives him any other aid in order that he may evade an arrest or trial, or the execution of his sentence. But no person who aids an offender in making or preparing his defense at law, or procures him to be bailed, though he afterwards escape, shall be considered an accessary."

At appellant's trial in the court below, the matters proved in behalf of the prosecution to establish the crime alleged were objected to by defendant both as irrelevant and insufficient to the issue. It is insisted that the facts permitted to be proven did not go to show either that defendant concealed May, or that he gave him aid such as to enable him to evade an arrest or trial.

In brief the facts proven were that, immediately after the

homicide, this defendant and May went off to themselves and had a private conversation, after which May mounted a horse and rode off. Defendant Blakely then told the only other two parties who were present that they must swear before the coroner's jury to a certain state of facts which he then and there detailed, and that if they did so it would appear to said jury, and they would so find, that May was justifiable in self defense in killing Daffin, and he would either be exonerated entirely or put upon a very light bond to answer the charge. Acting upon these suggestions, and through fear of May and defendant, the two witnesses did, at the coroner's inquest, swear, as did also Blakely, to the fabricated statement of the occurrence as devised by Blakely, and the result, as anticipated by Blakely, was that May was subsequently placed under a nominal bond, and that the grand jury for several terms of the district court thereafter failed to indict him for the murder, and he was only indicted after it leaked out and was ascertained that the testimony given by the witnesses at the inquest was false and perjured. On May's trial under indictment for the murder the two witnesses who had sworn on the inquest to the fabricated statement of Blakely, testified that they had sworn falsely, and developed the reasons and inducements causing them to do so. They also stated, as they declared truthfully, the facts attendant upon the homicide as they actually did occur, and upon this their testimony, corroborated as it was by other evidence, May was convicted of murder of the first degree, and his punishment was affixed by the verdict and judgment of the court at a term of seventy-five years in the penitentiary; which judgment on appeal was afterwards affirmed by this court. (23 Texas Ct. App., 146.)

It is perhaps necessary that we should further state that, after the conversation between May and defendant immediately following upon the killing, and after he had mounted a horse and ridden off as above stated, May did not appear at the coroner's inquest, nor was he seen for a day or so thereafter, until his appearance before the justice of the peace to enter into the nominal bond for his appearance above mentioned.

On this appellant Blakely's trial as accessary, the two witnesses also testified as in May's case to the facts with regard to the fabricated testimony at the inquest, and to the facts as they really occurred.

The objections presented to this testimony are thus stated in the able brief of counsel for appellant, viz:

"We submit that under our statute the "aid" given to an offender which the law denounces, is something which relates to the personal conduct of the offender after the offense, or an aid which obstructs the operation of the law in its executive branch, such as concealing the person of the offender, or advising him how to escape pursuit; furnishing him means to make his flight; putting persons in pursuit off the track, and not an aid which causes justice to slumber, or perverts its course, such as compounding with a felon, concealing the transaction either by silence or by perverting the facts so as to make that appear innocent which in truth is not."

Mr. Bishop says "the true test whether one is an accessary after the fact is whether what he did was by way of personal help to his principal to elude punishment, the kind of help being unimportant." (1 Bish. Crim. Law, 7 ed., sec. 695.) Mr. Wharton says: "Any assistance given to one known to be a felon, in order to hinder his apprehension, trial and punishment, is sufficient, it is held, to make a man an accessary after the fact." (1 Whart. Crim. Law, 8 ed., sec. 241.)

We are of opinion the facts we have stated, and upon which this case rests, bring it within the purview of the general law and our statute, supra, as to accessaries. Appellant, if he did not in fact conceal May until the perjured testimony was given which justified him before the inquest, certainly aided him to the extent that he was not arrested and punished for his crime until the perjury was discovered, and but for the discovery the aid which defendant attempted to give him would have proven effectual in affording him perfect and complete immunity from apprehension, trial and punishment for the murder he had committed.

It is true that, under the facts disclosed, defendant might have been prosecuted and convicted under our statute for subornation of perjury (Penal Code, art. 199), but this fact did not destroy nor affect his relation to the murder as an accessary; it was simply a question with the prosecution as to which of the offenses he should be tried for. We have discussed this branch of the case thus lengthily because of the fact that our statute as to accessaries has never before been directly construed. The disposition of the case, however, on this appeal must turn upon another question.

The main issue in this case, in so far as this defendant was concerned, is, did defendant fabricate the testimony, and did he

induce the two witnesses, Nelson and Henderson, to swear to the same before the coroner's inquest? This question is the all-important one, and it is the primary one requisite in the establishment of his guilt as accessary to the murder. Without that essential fact being ascertained positively and conclusively, his guilt is not established.

Now, it is in proof that defendant and these two witnesses were alone present when the matters transpired with regard to the fabricated statement about which they have testified; that is, that he told them what they should swear, and induced them to swear it. In agreeing to do so and in doing so, no matter what the motive, they made themselves accomplices, or *particeps criminis* in the offense which was committed by their false testimony. If a witness implicates himself, it is immaterial that he claims to have been coerced. (Davis v. The State, 2 Texas Ct. App., 588; Freeman v. The State, 11 Texas Ct. App., 92.) Our statute declares that "a conviction can not be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense." (Code Crim. Proc., art. 741.)

It is well settled that a conviction can not be had upon the uncorroborated testimony of two or more accomplices. (Roberts v. The State, 44 Texas, 119; Carroll v. The State, 3 Texas Ct. App., 117; Heath v. The State, 7 Texas Ct. App., 464.) One accomplice can not corroborate himself (Hannahan v. the State, 7 Texas Ct. App., 664), and the evidence of one accomplice can not be corroborated by that of another. (Heath v. The State, 7 Texas Ct. App., 464; Gonzales v. The State, 9 Texas Ct. App., 374; Phillips v. The State, 17 Texas Ct. App., 169.)

Outside the accomplice testimony of the two witnesses, there is no evidence that defendant fabricated and procured and induced them to testify to the same on the coroner's inquest. No one else was present and heard him tell them so, or saw him when the purported statement was made to them by defendant, or saw the parties together and under circumstances which would go to corroborate their testimony on this trial as to that fact.

On May's trial, the physical facts proven by other witnesses and other evidence directly contradicted and disproved the evidence at the coroner's inquest, and corroborated these accomplices in swearing that that evidence was untrue and that what they testified criminating May on the trial was true. But that

was a different case and a different issue from the one here presented. It is absolutely essential to the guilt of defendant in this proceeding that it should be proven that he told them what to swear and induced them to swear it. Proof that it was false amounts to nothing if the first proposition be not established; because they might have sworn falsely of their own motion, and for aught that appears they might have persuaded defendant to do so, and in either event defendant would not be guilty. The fact that the defendant himself swore on the coroner's jury as they did does not amount to a corroboration of their statement that he induced or made them swear as they did.

Under the law and the evidence, we are constrained to hold that the case against the appellant is not established with that certainty which would authorize us to permit it to stand as a precedent, because the accomplice testimony, upon which the conviction rests, has not been corroborated; wherefore the judgment must be reversed and the cause remanded.

*Reversed and remanded.*

Opinion delivered January 11, 1888.