### A. I. INGRAM v. THE STATE.

No. 3758. Decided January 19, 1916.

**1.—Murder—Evidence—Circumstances—Conduct of Defendant.**

Where, upon trial of murder, the State was seeking to corroborate the testimony of the wife of the deceased, knowing her testimony would place her in a position to be an accomplice to the crime, and that she would testify to adulterous relation existing between herself and defendant, and in order to corroborate her testimony and to show motive for defendant to kill deceased, there was no error in admitting testimony that defendant was seen at or near her house frequently, and that he telephoned her frequently from the sheriff's office, and this, although the defendant had not taken the stand and admitted such adulterous relation and that he frequently used the telephone.

**2.—Same—Circumstantial Evidence—Telephone—Conduct of Defendant.**

Where, upon trial of murder, the case depended upon circumstantial evidence and the State not knowing that defendant would testify and that it must rely upon circumstantial evidence to corroborate the testimony of the wife of the deceased, who testified for the State as an accomplice, there was no error in admitting testimony to prove the adulterous relation between the defendant and said witness that the defendant during such relations used the telephone in the sheriff's office so frequently and for so great a length of time that the sheriff had to object; besides, the defendant himself testified to such adulterous relations and that he frequently talked to the said witness over said telephone. Following Noftsinger v. State, 7 Texas Crim. App., 301.

**3.—Same—Evidence—Impeaching Own Witness.**

On trial of murder where defendant sought to impeach one of his own witnesses by showing that he had made a statement to others that his father, the deceased, had shot himself with his mother's pistol, whereas witness testified that he did not know whether it was his mother's pistol and had not stated that the deceased shot himself with his mother's pistol, there was no error in sustaining the State's objection thereto, as defendant could have known by reading the testimony of his said witness at the coroner's inquest that it was not his mother's or his father's pistol, said testimony having been tendered

to defendant and his counsel by State's counsel before defendant interrogated the witness; it thus appearing that the whole purpose of defendant was to lay a predicate to impeach his own witness and get testimony before the jury, which was inadmissible. Following Scott v. State, 20 S. W. Rep., 549, and other cases.

### 4.—Same—Rule Stated—Impeachment of Own Witness—Surprise.

Where one is surprised at the testimony of his witness who testifies to facts injurious to his cause, he then may show prior statements of the witness which are different from those to which he testified, and for this reason there was no error in admitting the statements of the State's witness before the grand jury, which was different from that which he made on the trial. But where defendant had been informed prior to the time he interrogated his witness and propounded to him the questions above stated, knowing that his witness had testified to a different state of facts at the coroner's inquest, he could not claim surprise, and there was no error in not permitting him to impeach his witness.

### 5.—Same—Evidence—Declarations and Acts of Defendant.

Where, upon trial of murder, the wife of the deceased testified for the State as an accomplice and the case depended upon circumstantial evidence, and the State had introduced testimony that the defendant some time after the death of the deceased and before defendant's arrest went to Temple and told the sister of the wife of the deceased in a confidential manner that the father of the deceased was accusing the wife of the deceased with said killing and that the defendant did not think she did the killing but thought it proper to let them know, there was no error in not permitting the defendant to introduce testimony that his witness told him that he had heard it rumored that the wife of the deceased was suspected of murdering her husband; as this was no explanation of his above statement and had no connection therewith.

### 6.—Same—Evidence—Supporting Testimony—Rule Stated—Cross-examination.

A witness can not be supported when the cross-examination goes only to test the truthfulness of his testimony and he was attacked in no other way, even if the weight of his testimony is weakened by such cross-examination; and especially where the witness resides in the county of the prosecution, is well known therein and not a stranger, and the State has introduced no testimony to impeach him. Following McCue v. State, 75 Texas Crim. Rep., 137.

### 7.—Same—Evidence—Cross-examination—Rebuttal.

Where, upon trial of murder, the defendant on his direct examination testified that he was an Odd Fellow, etc., there was no error in permitting the State on cross-examination to ask him whether or not he was then an Odd Fellow, to which he answered he had been, whereupon the State asked him if he had not been expelled from the lodge, and before counsel could object answered that he had been since he was charged with murder; the jury being instructed not to consider the answer of defendant that he had been expelled. Distinguishing Tijerina v. State, 74 S. W. Rep., 913.

### 8.—Same—Evidence—Impeachment of Witness.

Where, upon trial of murder, defendant's witness testified to material facts for the defendant, and on cross-examination denied that he saw defendant throw some money to the wife of the deceased, who was an accomplice and was shown to have had adulterous relations with the defendant, there was no error in permitting the State to show that the witness had seen the defendant do this; as this was a material issue in the case.

### 9.—Same—Argument of Counsel—No Reversible Error.

Where, upon trial of murder, the evidence showed adulterous relations between the defendant and the wife of the deceased, who had four children by the

deceased, there was no error in the argument of State's counsel that the record showed a home to have been debauched and four little children disgraced and their lives ruined, as said argument was based upon the evidence, and was partly in response to the argument of defendant's counsel, who denounced the wife of the deceased as a wayward and a wicked woman, etc.; besides, the court instructed the jury not to consider the argument of State's counsel.

**10.—Same—Argument of Counsel—Charge of Court.**

Where, upon trial of murder, State's counsel started to inform the jury why the wife of the deceased, who was an accomplice and was promised immunity, had done so, to which objections were sustained before any vital statement was made by the district attorney and the jury were instructed not to consider the argument of State's counsel, there was no reversible error.

**11.—Same—Charge of Court—Accomplice — Alibi — Circumstantial Evidence.**

Where, upon trial of murder, the conviction depended on the testimony of an accomplice and circumstantial evidence, and the defense had interposed an alibi, and the court properly charged the jury on the law of accomplice's testimony, circumstantial evidence and alibi, in language frequently approved by this court, there was no reversible error.

**12.—Same—Newly Discovered Evidence—Verdict by Lot.**

Where, upon appeal from a conviction of murder, the record failed to show that the evidence upon motion for new trial on the ground of newly discovered evidence and that the verdict of the jury was arrived at by lot, was filed during the term of court at which the trial occurred, the same can not be considered on appeal; besides, when considered showed no reversible error. Following Black v. State, 41 Texas Crim. Rep., 185, and other cases.

**13.—Same—Verdict by Lot—Rule Stated.**

Where the result is obtained by the jury by lot and this result is not adhered to, but a different punishment assessed in which all the jurors agree, it is not a verdict by lot. Following Pruitt v. State, 30 Texas Crim. App., 156, and other cases.

**14.—Same—Corpus Delicti—Sufficiency of the Evidence—Accomplice.**

Where, upon trial of murder, the testimony of the accomplice was sufficiently corroborated by other testimony, and independent thereof, was supported by circumstantial evidence tending to show that the defendant fired the shot which killed the deceased, the conviction for murder, under a proper charge of the court, was sustained. Following Kugadt v. State, 38 Texas Crim. Rep., 681, and other cases.

**15.—Same—Rule Stated—Accomplice's Testimony—Independent Testimony.**

It is not the rule in this State that the State must show, independent of the testimony of the accomplice, that the deceased was unlawfully killed, and while the testimony of the accomplice alone is not sufficient to establish that or any other fact, it is not the law of this State that the testimony of the accomplice must be wholly ignored; but the testimony of the accomplice must be taken in connection with the other facts and circumstances in evidence. Following Matthews v. State, 39 Texas Crim. Rep., 553, and other cases.

**16.—Same—Circumstantial Evidence—Corpus Delicti—Rule Stated.**

The fact that deceased was unlawfully killed may be shown by circumstantial evidence, and the further fact of defendant's connection therewith may also be shown by circumstantial evidence, and while the testimony of an accomplice is insufficient alone to establish these facts, yet it will be considered in establishing both of these facts, and if the evidence in addition to the accomplice's

Vol. 78 Crim.-36

testimony, although circumstantial, tends to show that the deceased was un-
lawfully killed and that defendant is guilty of the crime, the evidence is suffi-
cient to sustain the conviction. Following Gallegos v. State, 49 Texas Crim.
Rep., 115, and other cases.

### 17.—Same—Motion for Rehearing—Cases Discussed—Conflict of Decisions.

Where appellant by his counsel insisted that the original opinion of this
court was in conflict with the former decisions of this court on the various
points of law decided therein, but this court, upon a critical examination of
said former decisions, finds that they are not in conflict with the rules of law
laid down in the original opinion in this case, there is no reversible error. Dis-
tinguishing Turner v. State, 46 S. W. Rep., 830; Hunter v. State, 59 Texas
Crim. Rep., 439; Knight v. State, 65 S. W. Rep., 88; Tijerina v. State, 74 S.
W. Rep., 913; Millner v. State, 72 Texas Crim. Rep., 45; Woodward v. State,
97 S. W. Rep., 499; Gardner v. State, 11 Texas Crim. App., 265, and other cases.

### 18.—Same—Declarations and Acts of Defendant—Explanation.

Where, upon trial of murder, the wife of the deceased, who was an ac-
complice, testified for the State, and the case being one of circumstantial evi-
dence, the State, to show guilty knowledge on part of defendant, introduced the
confidential declarations of the defendant to the sister of said accomplice, be-
fore he was accused, to the effect that the father of the deceased was accus-
ing the said accomplice with the murder of her husband, and that defendant
did not believe she did the killing but thought he would let such sister and
the family know that said father of deceased was making this accusation, there
was no error in refusing to let defendant show in explanation of this state-
ment that his witness told defendant that it was rumored that some people
thought the wife of the deceased killed her husband, and that he acted upon
this information in making said statement; as the statement made by defend-
ant to the sister of said accomplice had no reference to this general rumor, but
purported to come from the father of the deceased, and there was no connec-
tion between the two statements. Distinguishing Turner v. State, 46 S. W.
Rep., 830, and other cases.

### 19.—Same—Objections to Testimony—Practice on Appeal—Rule Stated.

The insistence of counsel for appellant that the objections to the admissi-
bility of certain testimony was not the objection assigned by the State and
that this was reversible error, is untenable. It would be the height of folly
for this court to hold that certain testimony is inadmissible but because the
wrong reason was assigned by the State the cause should be reversed, and yet
upon another trial the court below should not admit the testimony. Distin-
guishing Hunter v. State, 59 Texas Crim. Rep., 439, and other cases.

### 20.—Same—Impeaching Own Witness—Case Stated.

Where, upon trial of murder, the State's witness had testified with refer-
ence to the identity of the pistol which was used in the shooting, practically
identifying it as defendant's pistol, but was afterwards recalled by the de-
fendant and gave affirmative testimony detrimental to the State to the effect
that this was not said pistol, there was no error in permitting the State to
introduce the testimony of said witness before the grand jury, which was wholly
at variance with his last statement and was substantially like his testimony
given on his examination in chief on this point. Distinguishing Knight v.
State, 65 S. W. Rep., 88, and other cases.

### 21.—Same—Evidence—Odd Fellows Lodge—Rebuttal Testimony.

Where, upon trial of murder, defendant testified that he was an Odd Fel-
low, seeking thereby to draw to his plea of innocence the well known recog-
nized idea that this lodge would not admit to membership men charged with
crime, it was permissible for the State to show that defendant was no longer
a member of that highly respected order, and when the State undertook to go
farther to show that the defendant had been expelled from said lodge since the
murder the court promptly sustained defendant's objection thereto, and there

was no reversible error.　Distinguishing Tijerina v. State, 74 S. W. Rep., 913, and other cases.

**22.—Same—Argument of Counsel—Dehors the Record.**

Where the district attorney did not get far enough along to tell the jury anything the accomplice said or did, with reference to being granted immunity, but apparently was just on the point of doing so when he was stopped by objections of defendant's counsel, which were sustained by the court, and the remarks withdrawn, there was no reversible error.　Distinguishing Millner v. State, 72 Texas Crim. Rep., 45, and other cases.

**23.—Same—Evidence—Contradicting Witness.**

Where, upon trial of murder, a witness for the defendant gave material testimony for the defendant, there was no error in permitting the State to show that he had made statements at variance with his testimony with reference to the relations existing between defendant and the wife of the deceased. Distinguishing Woodward v. State, 97 S. W. Rep., 499, and other cases.

**24.—Same—Evidence—Declarations and Acts by Defendant—Telephone.**

The fact testified to by the sheriff that defendant used his telephone frequently and talked over it a long time to the wife of the deceased was admissible in evidence in this case.　Distinguishing Gardner v. State, 11 Texas Crim. App., 265, and other cases.

**25.—Same — Accomplice's　Testimony — Circumstantial　Evidence — Rule Stated—Reasonable Doubt.**

The testimony, independent of the testimony of the accomplice, does not in and of itself necessarily have to establish the guilt of the accused beyond a reasonable doubt, all that is required is that it tends to connect the defendant with the commission of the offense, and when it does do so, as in the instant case, the conviction is sustained.　Following Holmes v. State, 70 Texas Crim. Rep., 423, and other cases.

Appeal from the District Court of Milam.　Tried below before the Hon. J. C. Scott.

Appeal from a conviction of murder; penalty, sixty years imprisonment in the penitentiary.

The opinion states the case.

*Lyles & Lyles, Henderson, Kidd & Gillis,* and *Ramsey, Black & Ramsey,* for appellant.—On question of declarations of deceased. Turner v. State, 45 S. W. Rep., 830; Early v. State, 51 Texas Crim. Rep., 382, 103 S. W. Rep., 868; Gaines v. State, 42 S. W. Rep., 385.

On question of grand jury testimony to impeach State's own witness: Knight v. State, 65 S. W. Rep., 88; Gibson v. State, 29 S. W. Rep., 471; Ozark v. State, 51 Texas Crim. Rep., 106, 100 S. W. Rep., 927; Skeen v State, 51 Texas Crim. Rep., 39, 100 S. W. Rep., 770; Smith v. State, 78 S. W. Rep., 519; Bennett v. State, 24 Texas Crim. App., 73.

On question of interrogating witness as to Odd Fellows Lodge: Tijerina v. State, 74 S. W. Rep., 913; Robins v. State, 83 S. W. Rep., 690, and cases stated in opinion.

On question of cross-examination of defendant's witness to impeach him:　Woodward v. State, 97 S. W. Rep., 499; Drake v. State, 15 S. W. Rep., 725; Parker v. State, 80 S. W. Rep., 1008; Cogdell v. State, 63 S. W. Rep., 645.

On question of argument of State's counsel: Millner v. State, 72 Texas Crim. Rep., 45, 162 S. W. Rep., 353; Johnson v. State, 63 Texas Crim. Rep., 50, 138 S. W. Rep., 1021; Davis v. State, 114 S. W. Rep., 366; Robbins v. State, 83 S. W. Rep., 690.

On question of defendant's talking over telephone: Gardner v. State, 11 Texas Crim. App., 365.

On question of court's charge on principals: Mennefee v. State, 67 Texas Crim. Rep., 201, 149 S. W. Rep., 138; Johnson v. State, 67 Texas Crim. Rep., 441, 149 S. W. Rep., 165.

On question of corpus delicti: Smith v. State, 58 Texas Crim. Rep., 106, 124 S. W. Rep., 920; Jones v. State, 59 Texas Crim. Rep., 559, 129 S. W. Rep., 1120; Clark v. State, 17 S. W. Rep., 942, and cases cited in the opinion.

*C. C. McDonald,* Assistant Attorney General, for the State.—Cited cases in opinion.

HARPER, JUDGE.—Appellant was convicted of murder and his punishment assessed at sixty years confinement in the State penitentiary.

In this case the State was seeking to corroborate the testimony of Mrs. L. W. Ward, the wife of deceased, the State knowing her testimony would place her in a position to be an accomplice to the crime, and knew she would testify to adulterous relations existing between herself and appellant, the State relying on this to show a motive for appellant to kill deceased, and to corroborate her, the State was adducing testimony that he was seen at or near her house frequently, and that he telephoned Mrs. Ward frequently. While making this proof the State called Charlie Smith as a witness and proved by him that appellant frequently used the telephone in the sheriff's office and talked a great length of time. That he, Smith, had ascertained Mrs. Ward's phone number was 409, and when appellant was talking over the sheriff's phone he went to another phone and called for 409, and found that it was busy. The State also proved that appellant used this phone so frequently and for so great a length of time, the sheriff had to object to appellant using the phone. At the time this testimony was offered appellant had not taken the stand and admitted the adulterous relations and had not admitted he talked several times a day—almost every day—with Mrs. Ward over the telephone. As said by this court in the Noftsinger case, 7 Texas Crim. App., 307, in a case depending on circumstantial evidence the mind seeks to explore every source from which any light, however feeble, may be derived. In this case, not knowing that appellant would testify, and he could not be compelled to do so, the State knew it must rely on circumstantial evidence to corroborate the testimony of Mrs. Ward as to adulterous relations, and the court did not err in admitting the testimony. If this were not true, after appellant himself testified to the adulterous relations and that he frequently talked to Mrs. Ward over the telephone—almost every day—the bills would not present error.

In the next bill it is shown that defendant called Leonard Ward, a son of deceased, as a witness and the record discloses that:

"When this witness was put on the stand and before he was asked any questions, the jury having been retired, the district attorney made the following statement:

" 'We anticipate that they put this witness on for the purpose of laying a predicate for impeachment of him, this is the young man, son of the deceased, and we want to state to them so that they can not claim surprise that this young man testified at the inquest which was held the night the body left here, that he did not make these statements and that he did not know anything about the pistol and we want to apprise them of the fact so that they can not claim surprise, and we tender them the evidence which they had at the habeas corpus and they had this sworn testimony of the inquest and they can not claim surprise when they ask him these questions.'

"My name is Leonard Ward. I live at Detroit, Texas. I used to live here in Cameron. I will be fourteen years old in August. I am the son of L. W. Ward, Jr., and his wife, Vasti Ward. I was living in Cameron at the time of the death of my father. I was at the house the night that he died. I was asleep at the time, but I got up. I was in a different room. The pistol shot woke me up, and I came into the room. There was a light in the room when I came in. My mother had lighted the lamp. When I went in the room, I saw papa laying on the bed. I saw my mother in there. There was nobody else. My mother said he had shot himself. I never saw the pistol in my father's hand until after Dr. Denson came. It was only a short while before he got there. When he came he found the pistol in his hand. He took it off and laid it on the bed. I broke it open and the cartridges fell out on the bed. There were five of the cartridges. It was not a sixshooter. It was size .38, and shot five cartridges. I think I would know the pistol if I saw it. This is it. (38 S. & W.) I do not know whose pistol it was. I never did see it until that night. I don't know whether it was my mother's pistol or not. I never saw it until that night. I don't know whether it was her pistol and whether she kept it in her trunk or not. I never saw it until that night. I did not trim one of the cartridges that went into the pistol. I never did see it. Mr. Story lives just across the fence from us. We lived on the same block, just a fence between us. It is about fifty yards. Dr. Denson got there in just a few minutes. Mr. Story got there a little while after Dr. John got there. A minute or two after Dr. John got there he sent me after Mr. Story. I called for Mr. Story after I got to his house. I told him papa had shot himself. I did not show him the bullets when I went in there. I did not have them there. I did not show Mr. Story the bullets and tell him that I had trimmed one of them and that was the one that my father was killed with. I did not break the pistol until after he came. I did not say I trimmed the cartridge because I never did see any .38 cartridges there. I did not tell him that I had trimmed one of the cartridges and that that was the bullet that killed my father. I did not tell him at that time

or at any other time. I went into the house at Mr. Story's. He got up and lighted a fire and let me in. I did not tell him that my father had shot himself with my mother's pistol. I did not say whose it was. I did not state that he had shot himself with my mother's pistol that she kept in her trunk. I did not say where my father got the pistol because I did not know whose it was. I did not tell him that I did not know how my father got the pistol out of the trunk. I did not tell him that the cartridge I trimmed was the one that killed my father. Mr. Story went back to our house with me. After we got back to the house Mr. Quinn Walker came over there. I don't know how long before he came. He was a pretty close neighbor, just the other side of Mr. Story's. He got there five or ten minutes after Mr. Story came."

The State did not cross-examine the witness further than to prove by him that he was fourteen years old, and had two sisters and a brother. After the witness had testified as above at the instance of defendant he sought to lay predicates to impeach the witness by asking him if he had not told Mr. Walker and others that his father had shot himself with his mother's pistol. The court sustained the objection of the State and would not allow appellant to lay predicates to impeach the witness, and sustained the objections of the State when appellant offered witnesses to impeach the witness as to the question above propounded. In this the court did not err, as it is made to appear that the witness had testified at the inquest and by his testimony it was made plain that defendant could not expect the witness to testify to any such state of facts as he had testified otherwise at the inquest and the inquest papers had been tendered appellant's counsel before he propounded any questions to the witness, and the witness had been called to lay predicates to secure the admission of testimony otherwise inadmissible, and which could be admitted only to impeach him. One can not himself call a witness knowing or being informed that he would not so testify and lay predicates to impeach his own witness and thus secure the admission of testimony otherwise inadmissible. Under the common law one was not permitted to impeach his own witness, as he was supposed to vouch for the truthfulness of a witness called by him but our statute has slightly modified that rule (art. 815, C. C. P.). Appellant can not claim that he was surprised at the testimony of the witness—that he thought he could prove by the witness that the pistol found by deceased was his mother's pistol. If the witness had so told the witnesses named by appellant he knew or could have known by reading the testimony when tendered him, that the witness had sworn at the coroner's inquest that it was not his mother's nor his father's pistol. So it is manifest that the whole purpose of appellant in placing the witness on the stand was to lay a predicate upon which he could impeach the witness and thus get testimony admitted which was otherwise inadmissible. The rule is clearly stated in Branch's Criminal Law, section 866, when one can and when one can not impeach his own witness. Scott v. State, 20 S. W. Rep., 549, is particularly in point. The authorities cited by appellant correctly hold, under our statute, when

one is surprised at the testimony of the witness, and the witness testifies to facts injurious to his cause, he then may show prior statements different from those which he testifies on the trial, and for this reason there was no error in admitting the statement Cozier Walker made before the grand jury. Had appellant not been informed prior to the time he called the witness Leonard Ward and propounded to him the questions he did, that the witness would not so testify, and had testified to a different state of facts at the coroner's inquest, he probably could claim that he was surprised at the testimony of the witness. But the bill and record discloses that he was given full information that the witness would not so testify, therefore there was no error in the ruling of the court.

The deceased was found in bed in a dying condition about 1 o'clock on the night of January 23, and subsequently his father shipped the body to Detroit for burial. Mrs. Ward, wife of deceased, had a sister living at Temple, Miss Minnie Mayse, and on making its case the State proved by Miss Mayse that on February 5th appellant came to Temple and told her the father of deceased had come back to Cameron, and was having the household goods shipped to Detroit, and that Mr. Ward, Sr., was blaming Mrs. Ward, Jr. (the wife of deceased) with the killing of the deceased, and that he, appellant, did not think Mrs. Ward did the killing. After this appellant placed Will Yates on the stand and offered to and could have proven by the witness that he told appellant that he had heard it rumored on the streets of Cameron that the wife of deceased was accused and suspected of murdering her husband. The witness would not have stated that he had heard Mr. Ward say so, nor that he so told appellant, nor would he have stated that he had heard a rumor that Mr. Ward accused his daughter-in-law of murder, nor did he so tell appellant. So the statement made by the accused to Miss Mayse, and the statement he could have proven was made to him by Will Yates were wholly different statements, and the court did not err in his ruling. If appellant could have proven by any witness that he had been told Mr. Ward was accusing his daughter-in-law of having committed the crime, such testimony should have been admitted, and this is all the authorities cited by appellant hold. But as the testimony of Will Yates would furnish no basis for the statement made by appellant to Miss Mayse, the ruling of the court presents no error.

After defendant had called Leonard Ward as a witness, and said witness had failed to testify to facts defendant desired, he, defendant, called Leonard Storey to testify as to what Leonard Ward had told him immediately after his father, L. W. Ward, was shot. And Leonard Storey testified that he was told by Leonard Ward that his father had killed himself with his mother's pistol; that he had cut the nose off of one of the bullets in the pistol, and this was the one that had killed his father. The State rigidly cross-examined the witness Leonard Storey and asked him if he had testified to such facts when before the grand jury, and the witness answered that no question had been propounded to him calling for such information. After this cross-examination the

State offered no proof as to what his testimony before the grand jury was, but stopped with the cross-examination of the witness, and in deference to appellant's contention, it may be stated the cross-examination was such as would probably affect the weight the jury would give to the testimony of Leonard Storey on direct examination, but this will not authorize the introduction of testimony in support of the witness where he resided in and was well known in the county in which the trial was had. Had the State offered any proof to contradict or impeach the testimony of the witness, the testimony of Allen Hooks and others would have been admissible as to what Storey had told them, but as the State contented itself with a rigid cross-examination and stopped there, the witness Storey could not be supported by showing that he had made similar statements to others as to the same facts he testified to on the trial. In McCue v. State, 75 Texas Crim. Rep., 137, 170 S. W. Rep., 280, et seq., we discussed the question of when a witness can and can not be supported, citing a great many authorities, and there held that a witness could not be supported when the cross-examination went only to test the truthfulness of the testimony, and he was attacked in no other way. Cross-examination is intended to test the truthfulness of the evidence given on direct examination, and to say, because a witness had been cross-examined in a manner to weaken the weight of his testimony, he could be supported, would render a trial endless, and inject into every case testimony supporting each and every witness and cause a jury to lose sight of the main issue on trial. The same rule applies as to the effort to support the testimony of Mrs. Leonard Storey. The State introduced no testimony to impeach her.

The defendant on his direct examination stated he was an "Odd Fellow." On cross-examination the State cross-examined him as to whether or not he was an Odd Fellow, and he answered that he had been. The State then asked him, "When were you expelled?" and appellant answered before objection could be made, "Since this has been against me." As the court promptly sustained the objection when made, and the question of whether or not he was a member of the Odd Fellows Lodge had been injected into the case on his direct examination by appellant, the bill presents no error. Had appellant not injected the matter into the case a different rule would prevail, but he having stated on direct examination he was an "Odd Fellow," it was permissible for the State to ask him if he said he was an Odd Fellow, and to elicit a reply that he had been. It was improper to ask, "When were you expelled from Odd Fellowship?" but as the court promptly sustained the objection to such question, and at once instructed the jury not to consider the answer, the bill presents no reversible error.

Wyatt Miller testified to material facts for defendant, and on cross-examination he was asked if he had not shadowed appellant and saw him throw some money to Mrs. Ward. He denied having done so, when he was asked if he had so told V. P. Wooley, and he said he had not. V. P. Wooley was permitted to testify that Wyatt Miller had so told him. Appellant contends this was permitting a witness to be impeached upon an immaterial issue. If it was upon an immaterial matter

his contention would be sound, but, as before stated, the relations existing between appellant and Mrs. Ward was a very material issue in this case.

In a bill it is shown that Hon. J. M. Ralston, in presenting the case to the jury, said, "The records show a home in Cameron has been debauched and four little children disgraced and their lives ruined. Who is the guilty party? The evidence shows he sits before this jury with unmitigated brazenry, not paralleled in the annals of crime." The court sustained an objection to this argument and instructed the jury not to consider it. If any error was committed it was in sustaining the objection to the argument, because the record disclosed, and appellant admitted he had gone into the home of L. W. Ward, Jr., and engaged in acts of sexual intercourse with his wife. The evidence further showed that they had four children, and necessarily such conduct reflected on the children. It is true, that under this record appellant is not the only one subject to censure, Mrs. Ward's conduct being equally censurable, yet we do not think the above remarks wholly unwarranted by the testimony. The bill further shows that counsel for appellant in presenting his defense, had been severe in their comments on Mrs. Ward, and said the evidence showed her to be a wayward and wicked woman, peddling her charms from San Angelo to Cameron— that she was a self-confessed adulteress and perjurer. Such remarks were not wholly unwarranted by the record, and appellant's counsel was authorized to make such remarks, having some foundation in the testimony, and other remarks of similar import if he deemed it advisable, but when State's counsel in reply to such remarks asked counsel for the defendant, "Why should you object, when you and your co-counsel stood before this jury and denounced this little woman as a strumpet, peddling her charms, and unworthy of belief?" This comment was also objected to. We are inclined to think the argument of both counsel for the State and appellant were legitimate under the record before us.

In another bill it is contended that the district attorney, in his closing address, said: "I want to tell you Mrs. Ward's attitude and what she did when she was promised immunity by your good county attorney and myself. When she went into the county attorney's office she said—" At this juncture the remarks were objected to, and while the objection was being made the district attorney continued, "She said, 'Do you want me to tell the whole thing?' If you could have seen her then." Here counsel for the State was told by the court to cease, and the court instructed the jury not to consider the remarks, and the district attorney said, "If you object I will withdraw it." The court said, "I have sustained the objection, and I now admonish the jury not to consider the remarks." Under such circumstances those bills complaining of the remarks of counsel and none of them present error.

We have carefully read the court's charge and appellant's exceptions thereto, and none of the exceptions present error. The court's charge on accomplice testimony, on circumstantial evidence, and on alibi is in

language frequently approved by this court. The charge of the court is an able and full presentation of the law of the case, under the testimony adduced, therefore it was unnecessary to give any of the special charges requested.

The alleged newly discovered testimony, in the light of the affidavit of C. H. Ruby, filed in reply to that ground of the motion, presents no reason why the court should have granted a new trial. Again, those grounds in the motion alleging newly discovered testimony and that the verdict was arrived at by lot are presented in a way we are not authorized to review them. The term of court at which appellant was tried adjourned June 4, 1915. The evidence heard on these grounds of the motion for a new trial was not filed in the trial court until the 27th day of August, 1915, seven weeks after the adjournment of court for the term. In Black v. State, 41 Texas Crim. Rep., 185, this court held:

"It is evident to our minds that these statutes refer exclusively to the statement of facts adduced on the trial of the case itself, and have no application to issues of fact formed on grounds set up in the motion for new trial. Except where the statute makes provision for the filing of papers, which shall become a part of a record on appeal, after the adjournment of court, these papers must all be filed during the term. Our statute has not made provision for the filing of evidence, either 'affidavits or otherwise,' which is adduced for the purpose of sustaining grounds of the motion for new trial, and we are not cited to any cases which so hold. Nearly every ground set out in the Code of Criminal Procedure which forms the basis of a motion for new trial involves matters of fact, and is the subject of contest. While this is true, the statute has not gone further, and provided, as in statements of facts, that this evidence can be filed after the adjournment of court. Nor could a statement of the evidence adduced upon the trial be so filed, except for the warrant of the statute above mentioned. It seems that a contest may be had on the motion for new trial as to the diligence of a defendant in seeking an application for continuance. This may be determined by evidence, and this may be adduced when the action of the court refusing the continuance is called in question by the motion for new trial. But it has been universally held, so far as we are aware, that the action of a court overruling an application for continuance must be perpetuated by bill of exceptions. We take it the same rule applies when the misconduct of the jury is alleged, or when the allegation is that the verdict has been decided by lot, or when a juror has received a bribe to convict, or that he has been guilty of any other corrupt conduct, or that any material witness for the defendant has been, by force, threats, or fraud, prevented from attending court, or where written evidence tending to establish the innocence of the defendant has been intentionally destroyed or removed so that it could not be produced upon the trial, and where newly discovered testimony is alleged. But these matters must be made part of the record during the term of court. There is no statute authorizing such matters to be perpetuated in papers filed subsequent to the term."

This rule has been adhered to since the rendition of that opinion, and we copy in full again this ruling that the profession may understand and preserve such matters in a bill of exceptions filed in term time, if they desire to have this court review the ruling of the trial court on such matters. If such rule is deemed inadvisable, the Legislature should be requested to change the law in respect to such bills, as it has in other instances. We will state, however, that we have read the affidavits of Messrs. Russell and Harrison attached to the motion for a new trial, and also the State's contest, including the affidavits of eleven of the jurors, including Messrs. Russell and Harrison; also the evidence heard on the trial, and if we were authorized to consider all these matters we would not be authorized to hold that the court erred It may be said that affidavits and evidence would disclose that the last ballot taken before adjourning for the night stood ten for conviction and two for acquittal. That when the jury convened next morning they discussed the case for some time, and it was agreed that each juror would write the punishment that should be assessed against appellant. That two of the jurors—Messrs. Russell and Harrison— wrote nothing, and the others wrote the term of years they thought should be assessed. This was added up and divided by twelve, and the result was between sixty-two and sixty-three years. After this was done, it was discussed, and the punishment was not fixed at this result, but by agreement of all the punishment was assessed at a different number of years, sixty years confinement in the penitentiary. While our decisions hold that an agreement beforehand to be bound by the result obtained in adding up the different number of years is a verdict by lot, yet many courts hold otherwise, where all jurors agree to it after the result of addition and division has been ascertained. We would not be understood as varying from the rule so long adhered to in this court, but the decisions of this court also have held always that where the result is obtained, and this result is not adhered to, and a different punishment assessed, to which all agree, it is not a verdict by lot. So if we could consider the statement of facts on this issue, the trial court did not err in overruling the motion for a new trial on this ground, but followed the rule adhered to in this court. Pruitt v. State, 30 Texas Crim. App., 156; McAnally v. State, 57 S. W. Rep., 832.

This brings us to a consideration of the only remaining question, and to our minds the most serious question in the case—that is, the contention that the corpus delicti is not proven in accordance with the rules of law. It is true it was necessary for the State to prove that deceased was unlawfully killed, and, second, if murdered, that appellant fired the fatal shot, or was a party to the crime. Appellant's contention is, however, that the State must show, independent of the testimony of the accomplice, that deceased was unlawfully killed, is not supported by the authorities. The testimony of the accomplice alone is not sufficient to establish that, or any other fact, is conceded, but that the testimony of the accomplice must be wholly ignored, is not sound. If an unlawful killing must be shown by evidence other

than that of the accomplice, the testimony of an accomplice would have no place in the record. We can and should consider the testimony in proving that or any other fact, but such testimony alone can not establish that or any other fact; there must be other facts and circumstances in the record tending to show that fact, corroborative of the accomplice testimony, as well as corroborative of the fact that appellant was the guilty party after a crime has been shown to have been committed. In the recent case of Kennedy v. State (not yet reported) we had occasion to investigate this question, and there we quoted from the opinion of Judge Hurt in Kugardt v. State, 38 Texas Crim. Rep., 681, wherein it was said: "In other words, in establishment of the corpus delicti the confessions are not to be excluded, but are to be taken in connection with the other facts and circumstances in evidence." This rule has been adhered to in this court in a number of cases since then. Little v. State, 47 S. W. Rep., 984; Matthews v. State, 39 Texas Crim. Rep., 553; Tidwell v. State, 40 Texas Crim. Rep., 38; Nicks v. State, 40 Texas Crim. Rep., 1; Gallagos v. State, 49 Texas Crim. Rep., 115; Frederickson v. State, 44 Texas Crim. Rep., 288; Sowles v. State, 52 Texas Crim. Rep., 17. By reading those cases and the authorities therein cited it is shown that the fact that deceased was unlawfully killed may be shown by circumstantial evidence, and the further fact, defendant's connection with the crime may also be so shown. It is further held, that a confession, or the testimony of an accomplice, while insufficient to establish that fact alone, will be considered in establishing both facts, and if the evidence, in addition to the accomplice testimony, tends to show that deceased was unlawfully killed and also tends to show appellant's guilt of the crime, the evidence is sufficient to sustain the conviction. And this need not be shown by direct testimony, but may be shown by circumstantial evidence. It would be remarkable if direct or positive testimony could be obtained to show that a murder had been committed when the killing takes place in the dead hours of night—in this instance about 1 o'clock at night, after deceased had undressed and gone to bed. It is unquestioned he was killed by a pistol shot, the ball entering his head in front about three-fourths of an inch from the hair line. There is some slight evidence raising the issue that deceased's wife might have killed him, and some that it might be a case of suicide. The court submitted both these issues to the jury and they found that appellant fired the shot that killed deceased while he was in bed. Mrs. Ward testified that appellant tried to get her to kill her husband, but she refused to do so, but that she did agree to appellant killing him. That during the day appellant had told her he would kill him that night, and that she lay awake expecting appellant; that she finally went to sleep and was awakened by a noise in the room; that then she heard a pistol fire, after which she got up and lit a lamp, and deceased was lying on the bed shot in the head, with a pistol laying in his left hand but not gripped. That she never saw the pistol before; that it did not belong to deceased. Appellant insists that this does not exclude the idea that deceased may not have shot himself, as no one saw the shot fired, nor saw appellant

at this house at this time. But the conversation she says she had with him the next day could be legitimately construed, if true, into an admission that he had caused the death. But we concede that her testimony alone would be insufficient to show that appellant was guilty of the crime, unless there are other facts and circumstances in evidence tending to connect appellant with the crime. It would be useless to recite the evidence showing the adulterous relations existing between appellant and deceased's wife, as he himself testified to such relations, and testified that they existed from the latter part of 1913 until the date of deceased's death, January 23, 1915. He also admits that in July, 1914, deceased caught him and Mrs. Ward in a compromising position at night, and appellant also admits that after that time it was not so easy for him to get access to Mrs. Ward at night; that "before he caught me her husband was sleeping across the hall and I would slip up to the window and talk to her and would have intercourse with her while he was in the other room; that afterwards the husband moved his bed into his wife's room." With this testimony of appellant in the record, a key is furnished with which to read the letter written by appellant to Mrs. Ward, which he admits writing, whether written in October, as he contends, or in December, as Mrs. Ward testifies. The letter reads:

"Dear Wife  I going to write you a few lines if my finger is hurting me  I do wish I could be with you to night  I would try to make you enjoy yourself the best I could  I do believe you love me sweet I love you better than anything are anybody in the world  Dear if you make up your mind and do what we were talking about I would be with you a hole lots of times but if you don't think it best why all right.

"I did not sleepe a bit good last night but my finger did not hurt like I thought it would  I went by about twenty minutes to ten Mama was there last night and we sit up and talke till eleven thirty and then went to bed  sweet heart I wish I could see you when I wanted to and be with you all the  so I would not have to write that is to cold and far off for me  Honey do you want to be tied up like this all the time are not  Dear one I know you don't  Honey if you was mine I could be with you all the time and feel good  Dear do you want me with you are had you rather do this way  sweet you are the dearest and sweetest little woman in the wide world but know what we are doing now is dangers to all off us so you decide and make up your mind what to do  Dear I wish I could see you now my finger is pretty sore but I am big and can stand a hole lot of punishment I do not like to punish by having to stay away from you for that is the worst one I have but dear it is not going to be that way all the time is it sweet  I heard you say no where are you anyway I am looking for you sweet sweet you are so dear to me  I got up at five this morning so I could write you but every one comes in stops me so I will close hopping to be with you soon for all night and day to Dear I will if I ever get that chance so good by to the sweetest woman in the world."

By all the testimony it is shown that this letter was written after

Mr. Ward had caught appellant and his wife in the compromising position, and after he had moved his bed into his wife's room. When he writes, "Dear, if you make up your mind and do what we were talking about I would be with you a whole lots of times," it is made plain what he means when she testifies that they had been discussing killing Mr. Ward, and especially is this true when we take the sentence, "Dear do you want me with you or had you rather do this way, but you know what we are doing now is dangerous to all of us, so decide and make up your mind what to do. I do not like to be punished by having to stay away from you, but dear it is not going to be that way all the time," etc. When we consider, according to appellant's own testimony, that this letter was written by him after the husband had moved his bed into his wife's room, and his easy access at night stopped, we can readily understand what was meant, and a jury would be authorized to draw deductions that he meant that deceased was not going to be in the way all the time, and this letter corroborates Mrs. Ward's testimony in many material particulars, and in and of itself alone would have a tendency to show that appellant took the life of deceased that deceased might no longer be an impediment to his being with Mrs. Ward in the night-time. Then again the pistol found by deceased, with which the fatal wound was inflicted, Mrs. Ward testifies her husband owned no such pistol. In this she was corroborated by her son Leonard Ward, who was called to the witness stand by appellant, and who testified that he had never seen the pistol before. It was a .38 caliber Smith & Wesson pistol. Leonard says he never saw the pistol until that night. This would support a finding that it was not a case of suicide. On the question of whose pistol it was, the pistol found by the dead man was introduced in evidence, and Milton Norton testified that he formerly worked for appellant in his meat market, and that he saw a pistol in the market in a pigeonhole under the counter and also in the desk; that he saw a small pistol there; that he never saw a pistol there like this (a .45 caliber pistol). "This is the pistol I saw there—the .38 caliber pistol found by deceased." Cozier Walker also testified on direct examination that he worked for appellant and said, "There was a pistol there in the market. It was kept under the cash register. I can not say that was the pistol (referring to the .38 caliber Smith & Wesson found by deceased). It is one like that—might have been a little brighter. About the same size."

Of course, the testimony of these witnesses was weakened on cross-examination, and appellant introduced testimony that the pistol seen in the market belonged to George Bolinger, and George Bolinger so testified on the trial. However, the State called the county attorney and three members of the grand jury, and they all testified when George Bolinger was before the grand jury Bolinger swore he owned no pistol and did not have one at the market. And the testimony further shows that if Bolinger had a pistol at the market it was a .45 caliber pistol, and Milton Norton is positive that the pistol he saw at the market was not that large a pistol; was a .38 caliber pistol. This testimony, if believed, would tend strongly to connect the defendant

with the commission of the offense. It would show deceased in possession of no such pistol, and appellant in possession of that character of pistol, with a motive for desiring that deceased be gotten out of his way where he could have easy access to his wife at night. The testimony further shows, exclusive of the testimony of Mrs. Ward, that when the body was shipped and she left to accompany it, she turned the keys of the house over to appellant; that upon getting to Detroit she wrote appellant, and in replying to the letter he sent her the newspaper clipping commenting on the death of her husband in which it was called a suicide, and said in the letter, "All is well at this time—I am sending you the clippings from the paper." These and other facts and circumstances in the case tend to show that the deceased was murdered in his bed at night, and tend to connect appellant with the commission of the offense, and when we also take into consideration the testimony of Mrs. Ward, the accomplice, it would authorize a jury to find that the testimony as a whole was of a conclusive nature, producing, in effect, a reasonable and moral certainty that the accused and no other person killed Mr. Ward.

The judgment is affirmed.

                                                              *Affirmed.*

### ON REHEARING.

### January 19, 1916.

HARPER, JUDGE.—Appellant's able counsel have filed an exhaustive motion for a rehearing, and a learned argument thereon,—the motion itself containing some fifty-nine pages of typewritten matter, while the argument embraces some thirteen pages of printed matter. We have carefully and thoughtfully read the papers filed, and re-read the entire transcript, and we find all of appellant's contentions summarized in the concluding paragraphs, which read as follows:

"The opinion shows that, in disposing of this appeal, the court pointedly fails to follow and apply the holding of all former authorities in the following particulars, towit:

"1. Considering the proceedings relating to the erroneous exclusion of the testimony of the witness Will Yates, as actually set forth in the record, the court's disposition of the error shown ignores the text of section 947, 2 Wharton, Crim. Ev. (10th ed.), pages 1826-1827, and overturns the holding in Turner v. State, 46 S. W. Rep., 830, and in other authorities cited in appellant's brief.

"2. Considering the proceedings relating to the erroneous admission in evidence of the written statement of the witness Cozier Walker, as actually set forth in the record, the court's disposition of the error shown pointedly disregards the holding in Knight v. State, 65 S. W. Rep., 88, and in other authorities cited in appellant's brief.

"3. Considering the proceedings relating to the misconduct of the district attorney in demanding that appellant 'tell the jury when and why you were expelled from the Odd Fellows,' as actually set forth in the record, the court's disposition of the error shown either overlooks

or disapproves the holding in Tijerina v. State, 74 S. W. Rep., 913; Levinski v. Cooper, 142 S. W. Rep., 959, and in other authorities cited in appellant's brief.

"4.   Considering the proceedings relating to the misconduct of the district attorney in his closing argument to the jury, as actually set forth in the record, the court's disposition of the errors shown is in total disregard of the holding in Millner v. State, 72 Texas Crim. Rep., 45, 162 S. W. Rep., 348, and in other authorities cited in appellant's brief.

"5.   Considering the proceedings relating to the erroneous admission in evidence of the impeachment testimony of the witness Woolly, as actually set forth in the record, the court's disposition of the error shown is contrary to the holding in Woodward v. State, 97 S. W. Rep., 499, and in other authorities cited in appellant's brief.

"6.   The failure of the court to reverse the judgment because of the erroneous admission in evidence of the testimony of the sheriff, Allen Hooks, is contrary to the holding in Gardner v. State, 11 Texas Crim. App., 265, and in other numerous authorities.

"The court's opinion, affirming the judgment, not only misinterprets, in vital particulars, certain proceedings contained in the record, and appears to be based upon a material misconstruction of the proceedings set forth and relied upon by appellant to show serious and reversible errors, but is so at variance with former holdings of this court and with other universally accepted authorities as to present not only confusion, but irreconcilable conflict of opinion on the questions involved.

"1.   The opinion holds, and in affirming the judgment applies the holding, that in testing the sufficiency of evidence relied upon to corroborate an accomplice, such evidence may be considered and interpreted by, and construed in the light of, the accomplice testimony,— all former decisions holding that in making such test the accomplice testimony must be eliminated.   (Smith v. State, 58 Texas Crim. Rep., 106, 124 S. W. Rep., 919; Hoyle v. State, 4 Texas Crim. App., 239; Hansen v. State, 11 S. W. Rep., 37; Jones v. State, 59 Texas Crim. App., 559, 129 S. W. Rep., 1118, and numerous other authorities cited in appellant's brief.

"2.   The opinion, in holding that the evidence supports the judgment, holds that accomplice testimony, if corroborated by other evidence, *remotely tending* to establish the essential facts at issue, warrants a judgment of conviction—all former decisions holding that to warrant a conviction on accomplice testimony it must be corroborated by other evidence, which, of itself, *tends directly and immediately* to establish the essential facts at issue.   (Clark v. State, 17 S. W. Rep., 942; McCowan v. State, 51 Texas Crim. Rep., 205, 100 S. W. Rep., 1157; Vails v. State, 128 S. W. Rep., 1117, and other authorities cited in appellant's brief.

"3.   The opinion holds in effect that motive on the part of the accused to commit the offense charged is sufficient corroboration of accomplice testimony to warrant a conviction—the earlier decisions expressly and pointedly holding that such motive is not the corrobora-

tion of accomplice testimony required by the statute. (Vails v. State, 59 Texas Crim. Rep., 340, 128 S. W. Rep., 1117.)

"If the court has not misinterpreted certain proceedings contained in the record, and if the holdings in the opinion, which are in conflict with former decisions, are advised and not the result of oversight or misconstruction, then it is submitted that the opinion should make special mention of the former decisions with which it is in conflict, and should expressly overrule such decisions, or otherwise reconcile the conflict and dispel the confusion."

It is thus seen that appellant's counsel are insistent that the opinion in this case is in conflict with the former decisions of this court in several material particulars, and, if so, the opinion should not be adhered to, for it was not the intention of the court to overrule a single rule of law announced in the cases cited by appellant, but either the court or appellant is in error in the conclusion reached that the evidence in this case brings the errors complained of within the rules announced in those cases.

The first contention is that in holding that the trial court committed no error in excluding the testimony of Will Yates this opinion is in conflict with the rule of law announced in Turner v. State, 46 S. W. Rep., 830, and other cases cited by appellant, and section 947, 2 Wharton, Crim. Ev. Turner's case, supra, is in no way applicable to the facts in this case. In that case it was held that the appellant should have been permitted to testify that deceased told appellant he had whipped his daughter as having a bearing on the state of mind of the appellant on the issue of manslaughter; and that the daughter ought to have been permitted to testify that her father (deceased) had in fact whipped her for going with appellant. The evidence of Will Yates could not and would not tend to show why appellant killed deceased, if he did do so, nor his state of mind in so doing. In fact, what Will Yates would testify to occurred after the homicide, and could not and would not have any bearing on why appellant killed deceased, if he did so. The homicide in this case occurred in the dead hour of night, while Mr. Ward was asleep, if he did not commit suicide. In Wharton's Criminal Evidence, section 947, the only sentence that could have any bearing on this case is where it is said, "And a satisfactory explanation of suspicious circumstances always operates in favor of the accused." This rule of law we do not question, but if necessary would reiterate, and so held in the recent case of Ward v. State, 78 Texas Crim. Rep., 121, 180 S. W. Rep., 240, and if the testimony of Will Yates would explain why appellant visited Temple and told Miss Mayse that deceased's father was accusing her sister of murdering her husband, the evidence should have been admitted, and we were in error in holding otherwise. Miss Mayse testified that appellant came to her at Temple one or two weeks after the homicide, on Friday—she thought the 5th of February,—and told her he wanted to see her privately, and told her that "Mr. Ward, Sr.,

had come to Cameron and was shipping her sister's things (Mrs. Ward, Jr., the wife of deceased) back home, and that he had been investigating the case and he understood was blaming her sister with the homicide, and that he did not think her sister did it, and he thought it was nothing but right to let us know that Mr. Ward, Sr., was trying to blame it on sister." The State did introduce this testimony, as contended by appellant, as one of the circumstances tending to show appellant's guilt; that he made this trip to Temple, and made this statement to Miss Mayse immediately after the discovery of a letter written by him to Mrs. Ward, Jr.,—found under the carpet by Tom Jameson. The letter so found is copied in the original opinion. This letter was read by Mr. Jameson and Henry Ruby, and then delivered by them to Sheriff Allen Hooks. This letter, if anything, is apparently what must have caused the talk on the streets of Cameron about which Will Yates would have testified. This is the only conclusion that can be reached from the record before us. It is true Sheriff Hooks showed the letter to Mr. Ward, Sr., who was having the things moved. but there is nothing in the record to show that Mr. Ward made any remark to Sheriff Hooks, Messrs. Jameson and Ruby, or either of them, when he read the letter, and this letter would more clearly point to appellant as the guilty party than to Mrs. Ward, Jr., or any other person. It is perhaps the discovery of this letter that led to appellant's arrest, and in and of itself would be a reason why appellant would visit the sister of Mrs. Ward, Jr., in an effort to get Mrs. Ward away from the home of the father of the deceased where she then was staying, but it would furnish no explanation of this visit to Miss Mayse consistent with his innocence. The fact that shortly after the discovery of this letter appellant visited Miss Mayse and told her that Mr. Ward, Sr., was charging her sister with the murder of his son and thus get her away from Mr. Ward's home and influence, is a strong circumstance against appellant's innocence. Now, if Will Yates would have testified that he told appellant Mr. Ward was charging Mrs. Ward, Jr., with the crime, this would have a tendency to explain his visit, but the bill does not show that Yates would have so testified. All the bill shows is that Yates would have testified: "One morning the defendant, Ingram, was in my shop and I had a talk with him, and said to him, 'Ab, it is rumored that some people think she killed that man and that he did not kill himself.' And he said, 'Surely not.' And knowing that he had something to do with the woman and as he was a friend to me, I said to him, 'Yes, and you had better lay low, for you were mixed up with the woman before this thing come up.' " Does this testimony furnish any reason why appellant should have gone to Temple and told Miss Mayse that Mr. Ward was charging her sister with the crime? Certainly Yates would not have testified he so told appellant, or the bill would have so stated. There is nowhere in the record a suggestion that Mr. Ward, to any person in Cameron, charged his daughter-in-law, Mrs. Ward, Jr., with the crime, and it was an explanation that would not have explained why appellant went to Temple and told Miss Mayse

that Mr. Ward was charging her sister with the crime. Mr. Ward's name was not mentioned by Yates, nor does any other person testify that Mr. Ward so stated to any person in Cameron. In fact the record is silent as to what Mr. Ward said in Cameron, if he said anything. It seems as soon as he was placed in possession of the letter found under the carpet he went to his home in Detroit to see his daughter-in-law and asked her about the contents of the letter, and if appellant ascertained that Mr. Ward was in possession of the letter, it furnishes a most cogent reason why he should want Mrs. Ward, Jr., out from under the influence of deceased's father, and the proposed testimony of Will Yates would not explain nor tend to explain why he visited the sister of Mrs. Ward at Temple and told her that Mr. Ward was blaming her sister with the death of his son. Mr. Ward apparently said nothing on his visit to Cameron; at least this record fails to disclose what he said, if he said anything. We are not overruling the case of Turner v. State, supra, nor the other cases cited by appellant on this point, but merely holding that the testimony of Will Yates would not explain nor tend to explain why appellant went to Temple and told Miss Mayse that Mr. Ward, Sr., was charging her sister with the murder of his son, when Yates' testimony shows that he had never heard that Mr. Ward had made such a charge, nor does any other witness testify that Mr. Ward had made any statement in Cameron that put such rumor afloat in Cameron. He was a stranger in that city, while Sheriff Hooks, Mr. Jameson and Mr. Ruby, who also read the letter, resided in Cameron, and if such a rumor was afloat in Cameron the natural inference would be that they and not Mr. Ward had put it in circulation. Mr. Ward was not a witness in this case, and the only intimation in the record that Mr. Ward ever charged his daughter-in-law with the crime is contained in her cross-examination by appellant. She testifies that when Mr. Ward returned to Detroit, where she was staying, that he had the letter written by defendant to her, which was found under the carpet (which appellant admits writing) and is copied in full in the original opinion, Mr. Ward came to her and said, "You or somebody else has killed my son and you've got to come across." That after thinking the matter over, knowing he had the letter, she made a full statement as testified to by her on this trial. This is the only time that Mr. Ward appears to have said anything, under this record, and this was after he had left Cameron and gone back to Detroit, and after appellant's conversation with Miss Mayse. Mr. Ward then got from Mrs. Ward, Jr., what appellant was fearful he would get, and furnishes the reason for his visiting Miss Mayse in an effort to get Mrs. Ward, Jr., away from the home of the father of the deceased.

Appellant, in his argument filed, insists that the objection urged by this court to the admissibility of the testimony was not the objection urged by the district attorney, and cites us to the case of Hunter v. State, 59 Texas Crim. Rep., 439, and other cases, wherein it is held: "It is well settled in this State that objections to testimony must set

forth the objections that were interposed, otherwise the action of the court below will not be revised." To this rule of law we adhere. It is a correct enunciation of the law, and relates solely to testimony admitted on the trial, as will be found by referring to the case above cited and other cases cited by appellant. It has no reference to testimony rejected, and which is admissible under no phase of the case. When testimony is excluded we pass on the question only of whether under the bill and the record it should have been admitted. If the record as a whole, and the bill, demonstrates conclusively that the testimony was not admissible under any phase of the case, certainly the court excluding it would not present error. If the testimony was admissible under any phase of the case, there would be error in excluding it, but if not, it would be immaterial what objection was offered,— the testimony being inadmissible under any theory of the case, the fact that the court gave as a reason for rejecting the testimony a certain reason, or the district attorney stated certain objections, would be immaterial. The question to be decided by us, was the testimony rejected admissible? If so, error would be presented. If not, certainly no error would be presented. It would be the height of folly for us to hold that certain testimony was inadmissible, but because the wrong reason was assigned, the case should be reversed, yet on another trial the court should not admit the testimony.

The next ground is that the court erred in admitting the statement made by Cozier Walker before the grand jury, and that in holding there was no error in admitting it we overruled the case of Knight v. State, 65 S. W. Rep., 88, and other cases cited by appellant. In that case it appears by the opinion that the State introduced Ben Smith as a witness and examined him and he was cross-examined and excused. That the State subsequently recalled him and laid a predicate to impeach him. The court says: "The witness (Ben Smith) had made no statement against the State, but had simply failed to make his testimony as strong as the State desired. This was simply a failure of testimony, and not the statement of a fact damaging to the State." That he could not be impeached under the circumstances stated is correctly held, and we adhere to that rule of law, but it is wholly inapplicable to the facts of this case. The State called Cozier Walker as a witness. On direct examination he testified to facts material to the State. There was a pistol found in the hand of deceased, loosely held. Cozier Walker testified on direct examination: "There was a pistol over there in the market. It was kept under the cash register. It was a kinder short pistol. I could not say that that was the pistol. (.38 S. & W. in evidence.) It is one about like that, might have been a little brighter, about the same size and I think it might have been a little brighter. . . . I think it was a pistol the size of that one but might have been a little brighter. It was not a pistol like this (.41). It was not a pistol like this (automatic). Mr. Ingram owned the market. Mr. Ingram owned the cash register. I saw the pistol pretty near all the time I worked there when I looked. When I noticed it

would be there." The pistol exhibited to the witness was the pistol found held loosely in the hands of the deceased. On cross-examination his testimony was slightly weakened. He was then excused, but next day was recalled by defendant, and gave affirmative testimony very detrimental to the State, in proving that the pistol held in the hands of deceased was not the pistol of appellant. This was not a failure to testify, but was giving testimony adverse to the State, wholly different to that given by him on the direct examination before being recalled by defendant, and wholly different from that given by him before the grand jury. When before the grand jury he testified: "During the time I worked for Mr. Ingram I would often see a pistol just like the one shown me here, which is a .38 Smith & Wesson. This is the same pistol or one just like it. It was kept in a pigeonhole right under the counter near the register. I would see it every time I would go around there. I saw it off and on till Mr. Ingram closed the market. The pistol was rusty just like this pistol shown me." This was the testimony the State had a right to expect the witness would give on the trial of this case. If he had only failed to give this testimony the State would not have had the right to impeach him, but when recalled by the defendant he gave testimony that tended strongly to show that the pistol found in the hands of deceased (a .38 Smith & Wesson) was not the pistol he saw in the market, but the pistol he saw in the market was a .41 caliber pistol. As the witness not only failed to testify to facts material to the State's case, as he had testified before the grand jury, but when recalled as a witness testified affirmatively to facts inimical to the State's case, there was no error in admitting the testimony of the witness before the grand jury. We are not overruling the Knight case, supra, but simply adhering to the rule announced in the cases of Baum v. State, 60 Texas Crim. Rep., 638, 133 S. W. Rep., 271; Williford v. State, 36 Texas Crim. Rep., 414; Self v. State, 28 Texas Crim. App., 398; Clanton v. State, 13 Texas Crim. App., 139, and cases cited in Branch's Criminal Law, sec. 866.

The next contention is that the court erred in holding that there was no error in permitting the district attorney to ask "when and where were you expelled from the Odd Fellows Lodge?" We did not hold that there was no error in permitting the district attorney to ask such question, but what we held was that as appellant in his testimony injected into the case that he was a member of the Odd Fellows Lodge, there was no error in permitting the district attorney to show that at the time of the trial he was not a member of the lodge. We specifically held that the district attorney should not have been permitted to go further, but that as appellant's objections were sustained to the questions propounded, and the jury instructed not to consider such questions, there was no error. This in nowise conflicts with the cases of Tijerina v. State, 74 S. W. Rep., 913; Levinski v. Cooper, 142 S. W. Rep., 959, nor other cases cited by appellant. In the Tijerina case, supra, it was merely held that questions should not be permitted where the purpose is merely to create prejudice against the defendant, and

to this rule of law we adhere.   In the case of Levinski v. Cooper, supra, it was held that if the question propounded was of so hurtful a nature that the exclusion of the answer would not cure the error, it would present error.   In neither of those cases had it been testified affirmatively by appellant to a given fact that would be beneficial to him, which fact the State knew he was not entitled to have operative to his benefit.   In this case appellant had testified he was a member of the Odd Fellows Lodge, which if true would necessarily inure to his benefit on the trial of this case.   The State knew, as a matter of fact, when this prosecution arose that the Odd Fellows Lodge had required appellant to withdraw from its membership.   If appellant had not sought by his testimony to secure to himself the benefit accruing from membership in so highly respected an order, of course the State should not have been permitted to prove that he no longer was a member of that order.   But when appellant, as a witness, testified that he was a member of the Odd Fellows Lodge, hoping thereby to draw to his plea of innocence of this crime the well known and recognized idea that this lodge would not admit to membership men charged with crime until their innocence was known, it was permissible for the State to show that he was no longer a member of that highly respected order.   And when the State undertook to go further than this, the court promptly sustained the objection of appellant, therefore no error is presented. The Odd Fellows Lodge is an order highly respected in this State, and each and every juror that might be empaneled would appreciate the fact, and when appellant in this case sought to bring to bear the influence that might be brought to bear by reference to his membership in such order, it was permissible for the State to show that that lodge no longer threw its protecting shield about the appellant.   If appellant had not sought to show that he was a member of the Odd Fellows Lodge and thus secure to himself the benefit accruing from such membership, then the testimony introduced by the State should not have been admitted, but when appellant offered evidence that he was a member of the Odd Fellows Lodge, then testimony that he was no longer a member of that order became admissible, and this fact could be shown on cross-examination of him.

Neither do we think this opinion is in any way in conflict with that of Millner v. State, 72 Texas Crim. Rep., 45, 162 S. W. Rep., 355, wherein it was held that the argument of counsel in that case presented error.   In that case the objection to the argument was overruled, and the argument permitted.   In this case the bill shows the district attorney said:   "I want to tell you her (the witness Mrs. Ward) attitude and what she did when she was promised immunity by your good county attorney and myself.   When she went into the county attorney's office she said——."   Here objections were made to the argument, and the court sustained the objections.   However, the district attorney continued and said:   "She said, 'Do you want me to tell the whole thing?'" The court then stated:   "I have sustained the objection, and I now admonish the jury."   The bill further shows the district attorney con-

tinued and said, "If you could have seen her then——." Here the district attorney was stopped and the court said, "I have sustained the objection, and told the jury not to consider the objectionable remarks." The district attorney then stated, "If you object, I will withdraw the remark." It is thus seen how wholly dissimilar are the facts in this case to the facts in the Millner case, supra, upon which appellant relies. In this case his objections were sustained, and the district attorney withdrew the remarks. The district attorney did not get far enough along to tell the jury anything Mrs. Ward said or did, but apparently was just on the point of doing so when he was stopped. District attorneys in their zeal should never go out of the record, nor seek to get anything before the jury not in evidence, and if they do so and the trial court does not sustain the objections when made, and the remarks are hurtful and harmful, of course such matter will present error. But if the objections when made are sustained and the jury instructed not to consider the remarks, unless the remarks are of such nature that the harm done can not be removed by instructions not to consider the objectionable argument, no reversible error is presented. If appellant did not think the instructions of the court given at the time he sustained the objections sufficient to remove any and all harmful effect, he should have requested further instructions in writing. This he did not do, and the rule is, as said by the court in Pennington v. State, 48 S. W. Rep., 507, where the remarks were excepted to but no charge in regard to them was asked, no error is presented. See also Trotter v. State, 37 Texas Crim. Rep., 468; Miller v. State, 35 Texas Crim. Rep., 209; Morris v. State, 35 Texas Crim. Rep., 313; Levine v. State, 35 Texas Crim. Rep., 647, and cases cited.

The next insistence is that in holding there was no error in permitting V. P. Wooley to testify, "that Wyatt Miller had stated to him he had shadowed his brother (appellant) and saw him throw some money into the yard of Mrs. Ward," appellant contending that such holding· is in conflict with Woodward v. State, 97 S. W. Rep., 499. By reading that case it will be seen it was dealing with a wholly different state of facts. In that case it was not in regard to anything the person on trial had said or done, but the witness was asked if he, witness, "had not said there would be somebody killed over there in three days." That was a prediction that a killing would occur, and which did occur, but the person on trial was in no way connected with such prediction or remark being made, and did not know it had been made. In this case Wyatt Miller was a material witness for the defendant, and it could be shown that he had made statements at variance with his testimony on this trial about a matter which was material to the case,—the relation existing between Mrs. Ward and appellant, and such holding is nowise in conflict with the Woodward case, supra, but is in accordance with the rule that has always prevailed in this court. Gonzales v. State, 35 Texas Crim. Rep., 33; Newman v. State, 70 S. W. Rep., 951, and cases in Branch's Crim. Law, sec. 871.

It is contended that our holding that the testimony of Allen Hooks

was admissible is in conflict with the opinion of this court in Gardner v. State, 11 Texas Crim. App., 265. In that case the wife of deceased was permitted to testify that Gardner had made improper proposals to her, which fact was unknown to deceased. The court held that this fact being unknown to deceased, it could have had no bearing on the difficulty or the cause leading up to it, was testimony which would prejudice the jury against Gardner, and as it had no bearing on the issues involved in the case on trial, it should not have been admitted. What Sheriff Hooks testified to was the frequent use of his telephone by appellant. Certainly appellant knew that he frequently used this telephone, if he did so, and it was a circumstance in the chain of evidence showing the relations existing between Mrs. Ward and appellant. Appellant at the time this testimony was admitted had not testified and it was not known he would take the stand and admit the adulterous relations. It may be true that appellant did not know Sheriff Hooks objected to his using the telephone so frequently, but the sheriff's reasons for objecting, as stated by him, "My phone rings, I expect, 50 or 100 times a day and probably more, and I had to put in long distance calls, and I can not afford to let anyone talk over it long at a time," certainly could in no way be injurious to appellant. The fact testified to by the sheriff, that appellant used his telephone frequently and talked over it a long time, was admissible, when it was further shown that he was talking to Mrs. Ward at those times.

The next contention of appellant is a general assault on the opinion as a whole, and by the remarks used show a misconception of the holding of the court. What we held was that the accomplice testimony might be taken into consideration in passing on the corpus delicti—that is, whether or not Mr. Ward had been unlawfully killed, and such holding is not in conflict with the authorities, but is supported by an unbroken line of decisions by this court. Mr. Branch in his work on Criminal Law, section 235, says the confession may be used to aid the proof of the corpus delicti, citing Kugadt v. State, 38 Texas Crim. Rep., 681; Jackson v. State, 29 Texas Crim. App., 458; Anderson v. State, 34 Texas Crim. Rep., 546; Gallegos v. State, 48 Texas Crim. Rep., 58; Gallegos v. State, 49 Texas Crim. Rep., 115; Attaway v. State, 35 Texas Crim. Rep., 403; Lott v. State, 60 Texas Crim. Rep., 162, 131 S. W. Rep., 553; Nicks v. State, 40 Texas Crim. Rep., 1; Cox v. State, 69 S. W. Rep., 145; Landreth v. State, 44 Texas Crim. Rep., 239; Austin v. State, 51 Texas Crim. Rep., 327; Bradshaw v. State, 49 Texas Crim. Rep., 165; White v. State, 40 Texas Crim. Rep., 366; Sullivan v. State, 40 Texas Crim. Rep., 633. In this latter case Judge Davidson says: "It is well settled that the confession of the accused alone will not justify a conviction. That question has been frequently decided by the various decisions of this State; but, so far as we are aware, it is settled that the death of the deceased being shown to have been brought about by the criminal agency or procurement of someone, the confession is sufficient to connect the party making the confession with the crime." And in Ander-

son v. State, this court, speaking through Judge Hurt, held: "The corpus ·delicti can not be proven by the uncorroborated testimony of an accomplice. Nor can the corpus delicti be proven alone by the confession of the accused. Must it be proven independent of the confession? This is not necessary." Again, in the Kugadt case, supra, that learned jurist held:

"The general doctrine is that extra-judicial confessions, standing alone, are not sufficient proof of the corpus delicti; and some of the cases hold that the corpus delicti must be proved independently of confessions. But we do not understand such to be the better doctrine. In other words, in the establishment of the corpus delicti the confessions *are not to be excluded,* but are to be taken in connection with the other facts and circumstances in evidence. See note 3 to case of State v. Williams, reported in 78 Am. Dec., p. 248. And this rule is recognized in this State. See Jackson v. State, 29 Texas Crim. App., 458. Said case quotes with approval an excerpt taken from 4 American and English Encyclopedia of Law, p. 309, as follows: 'A confession is sufficient, if there be such extrinsic corroborative circumstances as will, taken in connection with the confession, produce conviction of the defendant's guilt in the minds of a jury beyond a reasonable doubt.' 'Such suppletory evidence need not be conclusive in its character. When a confession is made, and the circumstances therein related correspond in some points with those proven to have existed, this may be evidence sufficient to satisfy a jury in rendering a verdict asserting the guilt of the accused. *"Full proof of the body of the crime, the corpus delicti, independently of the confession,* is not required by any of the cases; and in many of them slight corroborating facts· were held sufficient." ' 3 Am. & Eng. Enc. of Law, p. 447. We take it that there can be no question that the prosecution is permitted to prove by circumstantial evidence the corpus delicti, *and in aid thereto use confession of the appellant."*

Wharton's Criminal Evidence, section 634 (10th ed.), states the rule to be: "As to the corpus delicti, the evidence need not be direct, but it may be established by circumstances corroborating the confession, and the *confession itself may be considered* together with all the other evidence to establish the fact that a crime was committed," citing many authorities.

In this case there can be no question that the fact that the dead body of Mr. Ward was found, undressed, lying on his bed with a bullet hole in his head; that this wound caused his death. This is shown by the testimony of Dr. Denson and a number of other witnesses. Appellant sought to inject the issue of suicide in the case by proving statements made by Mrs. Ward and her son on the night of the homicide. There was no direct testimony raising such issue, but it was raised indirectly in this way. In proving that the death of Mr. Ward was caused by unlawful means, must the testimony of Mrs. Ward, a confessed accomplice, be excluded, as appellant contends? Under all the authorities above cited, and we have none in this State holding

otherwise, the testimony of the accomplice will not be excluded in passing on that issue, but it will and should be considered in connection with all the other facts and circumstances in the case. If there were no other facts and circumstances in evidence, of course the accomplice testimony alone would not prove that fact. But we have no such case. The authorities cited by appellant announce no contrary rule. In those cases the question being passed upon was not whether the confession or accomplice testimony could be considered in connection with other facts and circumstances in passing on whether or not a crime had been committed, but was passing on the question as to the *connection* of the person on trial with the crime, and it was held that there must be other facts and circumstances in evidence, in addition to the accomplice testimony, tending to connect the person with guilty participation in the crime before a conviction is authorized. This rule of law we do not question, and there is nothing said or held in the original opinion, in our opinion, that would bear the construction that we held or intended to hold that a person could be convicted upon the uncorroborated testimony of an accomplice. But the testimony, independent of the testimony of the accomplice, does not in and of itself necessarily have to establish the guilt of the person on trial beyond a reasonable doubt,—if so, there would be no necessity nor place for the accomplice testimony. All that the testimony, in addition to the accomplice testimony, need to do is to, by and in of itself, tend to connect the defendant with the commission of the offense charged. This is the law in this State by virtue of article 801 of the Code of Criminal Procedure. In Vernon's Crim. Proc., section 15, under article 801, the authorities are collated and the rule stated to be:

"Corroborative evidence is sufficient if it tends to connect defendant with the crime. It need not be sufficient to convict nor need it corroborate in detail. Wilkerson v. State, 57 S. W. Rep., 956; Bruton v. State, 21 Texas, 337; Coleman v. State, 44 Texas, 109; Gillian v. State, 3 Texas Crim. App., 132; Jones v. State, 7 Texas Crim. App., 457; Clanton v. State, 13 Texas Crim. App., 139; Crowell v. State, 24 Texas Crim. App., 404, 6 S. W. Rep., 318; Boyd v. State, 24 Texas Crim. App., 570, 6 S. W. Rep., 853, 5 Am. St. Rep., 908; Elizando v. State, 31 Texas Crim. Rep., 237, 20 S. W. Rep., 560; Warren v. State, 67 Texas Crim. Rep., 273, 149 S. W. Rep., 130; Holmes v. State, 70 Texas Crim. Rep., 423, 157 S. W. Rep., 487; Gillespie v. State, 73 Texas Crim. App., 585, 166 S. W. Rep., 135; Savage v. State, 75 Texas Crim. Rep., 213, 170 S. W. Rep., 730; Cooper v. State, 77 Texas Crim. Rep., 209, 177 S. W. Rep., 975.

"The corroborating evidence to be sufficient must, of itself, and without the aid of the accomplice testimony, tend in some degree to connect the defendant with the commission of the offense for which he is on trial, but it need not be sufficient of itself to establish his guilt. It must tend to connect the defendant with the offense committed. It must be as to a material matter. It must tend directly and immediately, not merely remotely, to connect the defendant with the com-

mission of the offense. Corroboration as to immaterial facts, having no tendency to connect the defendant with the commission of the offense, is not sufficient. The corroboration must be as to a criminative fact or facts. But it need not be corroborative of any particular statement made by the accomplice. The corroboration is not sufficient if it merely shows the commission of the offense by some person; it must go further, and tend to connect the defendant with its commission. The accomplice testimony need not be corroborated circumstantially and in detail, and if corroborated in material matters, it is unimportant that it was also corroborated in immaterial matters, as it is permissible to strengthen such testimony by proof of connected incidents tending to show its reasonableness and consistency. Dill v. State, 1 Texas Crim. App., 278; Nourse v. State, 2 Texas Crim. App., 304; Davis v. State, id., 588; Jones v. State, 3 Texas Crim. App., 575; Hoyle v. State, 4 Texas Crim. App., 239; Jones v. State, id., 529; Jackson v. State, id., 292; Tooney v. State, 5 Texas Crim. App., 163; Myers v. State, 7 Texas Crim. App., 640; Simms v. State, 8 Texas Crim. App., 230; Roach v. State, id., 478; Bruton v. State, 21 Texas, 337; Watson v. State, 9 Texas Crim. App., 237; Weldon v. State, 10 Texas Crim. App., 400; Jernigan v. State, id., 546; Harper v. State, 11 Texas Crim. App., 1; Cohea v. State, id., 622; Powell v. State, 15 Texas Crim. App., 441; Dunn v. State, id., 560; Zollicoffer v. State, 16 Texas Crim. App., 312; Phillips v. State, 17 Texas Crim. App., 169; Harrison v. State, id., 442; Tisdale v. State, id., 444; Blakely v. State, 24 Texas Crim. App., 616; 7 S. W. Rep., 233, 5 Am. St. Rep., 912."

With this well established statutory rule before us, let us consider what the testimony in this case tends to show, independent of the testimony of Mrs. Ward. The death of Ward is shown beyond question. Appellant himself takes the stand and testifies to adulterous relations between himself and Mrs. Ward; he testifies that Ward caught him and Mrs. Ward in a compromising position at night; he testifies that Ward then moved his bed into the same room with Mrs. Ward, and that he could not go there at night and have carnal intercourse with Mrs. Ward as he had theretofore been doing. A letter is found under the carpet in the dead man's house. Appellant admits he wrote this letter to Mrs. Ward subsequent to the time deceased had caught him and Mrs. Ward in a compromising position. In this letter he says, "I do wish I could be with you tonight. I would try to make you enjoy yourself the best I could. Dear, if you make up your mind and do what we were talking about I could be with you a whole lots of times. . . . Sweetheart, I wish I could see you when I want to and be with you, so I would not have to write; that is too cold and far off for me. Honey, do you want to be tied up like this all the time or not? Dear one, I know you don't. Honey, if you was mine I could be with you all the time and feel good. You know what we are doing is dangerous to all of us, so you decide and make up your mind what to do. I do not like to punish by having to stay away from you for that is the worst punishment I have, but, dear, *it is not going to be*

*that way all the time,"* etc.  In the light of appellant's own testimony, that after deceased had caught him, he moved his bed into his wife's room so that he, appellant, could no longer go there at night and have intercourse with his wife, what are the natural and only deductions to be drawn from this letter admitted by appellant to have been written by him?  "It is not going to be this way all the time."  How was the condition to be remedied except by the removal of Mr. Ward, and after this letter was written he was "removed" by a pistol shot in the head in the dead hours of night.  Does not this letter have a tendency to connect appellant with the removal of Mr. Ward, so that he could renew his amorous relations in the night-time, when appellant's own wife would know nothing about his conduct?

Then, after Ward's death, when Mrs. Ward goes with the body to Detroit, he admits he clipped out of the newspapers the comments on the death, wherein it is termed a suicide, based on what Mrs. Ward told the night of the death, and sends them to Mrs. Ward, writing at the same time, "All is well at this time."  When the letter is found, which would lead anyone to believe that the writer of the letter had something to do with the death of Mr. Ward, we find appellant going to Temple, and telling Miss Mayse that Mr. Ward, Sr., was charging her sister with the murder of his son.  Why does he of all men fly to the rescue of Mrs. Ward and champion her innocence?  There is no testimony that the dead man owned a pistol of the character and kind that inflicted the fatal wound, while the testimony of Milton Norton and Cozier Walker on direct examination would authorize a jury to find that it was appellant's pistol found clasped loosely in the deceased's hand.  These are facts and circumstances in evidence independent of the testimony of the accomplice, Mrs. Ward, and can we say or hold that they have no tendency to connect appellant with the death of Mr. Ward?  If you can not so say and hold, then the testimony of the accomplice, Mrs. Ward, is corroborated in material matters, tending directly and immediately to connect the defendant with the commission of the offense, which testimony is independent of and in addition to her testimony, coming from other and different sources.

There are other matters presented in the lengthy motion for a rehearing, but they were all disposed of in the original opinion, and we do not deem it necessary to write again on them, but the above questions were summarized by appellant and pressed by him, and are the questions seemingly relied on, and out of deference to the earnestness with which they are pressed by appellant's able counsel, we have written at length on those questions, but after a renewed study of the record we are most thoroughly convinced that no error is presented which would justify a reversal of the case, and the motion for a rehearing is overruled.

*Overruled.*